# Exhibit B

**Kim, Helen B.**

| | |
|---|---|
| **From:** | Richard Epstein <REPSTEIN@sillscummis.com> |
| **Sent:** | Thursday, March 8, 2018 1:45 PM |
| **To:** | Kim, Helen B. |
| **Subject:** | RE: In re Bankers Conseco Life Ins. Co. v. Beechwood Re Limited |
| **Attachments:** | SKM_C654e18030209070.pdf; Confidentiality Agreement.pdf; SKM_C654e18030209060.pdf |

Helen – Thank you for you call today. As you requested, attached are: (i) the arbitration demand (without exhibits); (ii) the confidentiality agreement and protective order entered by the arbitration panel; and (iii) the arbitration panel's January 23, 2018 order confirming that the confidentiality agreement applies to documents produced by non-parties.

As you informed me during today's call, your clients – Obex and Mr. Katzenstein – will produce responsive documents to Document Requests Nos. 1 and 4 contained in the subpoenas, and have no documents responsive to Document Requests Nos. 3 and 5. As to Document Request No. 2, you will review the attachments to this e-mail and then speak with me early next week to see if we can amicably resolve any issues your clients may have may as to the scope of that Request.

Thank you for your time and attention to this matter. Rich

**Richard H. Epstein**
General Counsel and Co-Chair, Litigation Department

 Sills Cummis & Gross P.C.

website | bio | vCard | newsroom | email

One Riverfront Plaza, Newark, NJ 07102
p (973) 643-5372 | f (973) 643-6500 map

**From:** Kim, Helen B. [mailto:HKim@thompsoncoburn.com]
**Sent:** Thursday, March 08, 2018 4:09 PM
**To:** Richard Epstein <REPSTEIN@sillscummis.com>
**Subject:** In re Bankers Conseco Life Ins. Co. v. Beechwood Re Limited

Mr. Epstein:

Per our telephone call today, please send me a copy of the Arbitration Demand in the above-referenced AAA arbitration.

In our conversation, you also referenced a confidentiality agreement. If you feel it pertinent, please send that, as well.

Thank you,

**Helen B. Kim**
hkim@thompsoncoburn.com
P: 310.282.9430
F: 310.282.2501

1

M: 323.828.9114

**Thompson Coburn LLP**
2029 Century Park East
19th Floor
Los Angeles, CA 90067
www.thompsoncoburn.com

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

NOTICE: The contents of this email and any attachments to it contain confidential and/or legally privileged information from the law firm of Sills Cummis & Gross P.C. This information is only for the use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of the contained information is strictly prohibited and that the documents should be returned to this firm immediately. In this regard, if you have received this email in error, please notify us by email immediately.

**Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Sills Cummis & Gross P.C. for any loss or damage arising in any way from its use.

This email message has been scanned for viruses by Mimecast.

In the matter of arbitration between:

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x

BANKERS CONSECO LIFE INSURANCE            :
COMPANY and WASHINGTON NATIONAL           :
LIFE INSURANCE COMPANY,                   :        **CLAIMANTS' DEMAND FOR**
                                          :        **ARBITRATION,**
            Claimants,                    :        **STATEMENT OF CLAIM, AND**
                                          :        **REQUEST FOR EMERGENCY RELIEF**
      v.                                  :
                                          :
                                          :
BEECHWOOD RE LIMITED,                     :
                                          :
            Respondents.                  :

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\- x

Claimants Bankers Conseco Life Insurance Company ("BCLIC") and Washington National Insurance Company ("WNIC"), by and through their counsel, hereby allege as follows for their Demand for Arbitration, Statement of Claim and Request for Emergency Relief against Respondent:

## NATURE OF THE ACTION

1.      This action emanates from the widely-publicized Platinum fraud.  To date, the Platinum fraud has resulted in a criminal prosecution against one scheme participant, and other co-conspirators remain under investigation by multiple federal agencies of the federal government.  Claimants are victims of that fraud.

2.      For years, Platinum Partners, LP has managed investment funds – also bearing the name "Platinum" (Platinum Partners, LP, the Platinum funds and their affiliates shall be referred to as "Platinum" in the Demand) – that reported outsized returns, purportedly by investing in high-risk and speculative investments.  Those investments were often with disreputable principals and companies.  Platinum was owned and managed by Murray Huberfeld and Mark Nordlicht, each of whom have checkered pasts.  Huberfeld, for example, has a criminal record.

3.    Institutional investors such as insurance companies typically would not make significant (or any) investments in high-risk funds like Platinum.  However, Platinum sought new investors and especially institutional investors for their funds.

4.    In 2012 and 2013, Platinum's founders, Huberfeld and Nordlicht, stepped up their efforts to acquire funds from institutional investors with the goal to continue the Platinum fraud. Platinum, however, could not successfully and credibly seek investments directly from institutional investors, so Huberfeld and Nordlicht hatched a plan to obtain institutional investor capital through fraudulent means.

5.    Specifically, and hidden from Claimants until recently, Huberfeld and Nordlicht partnered and conspired with Moshe M. Feuer, Scott Taylor and David Levy (Huberfeld's nephew) to form a reinsurance company, Beechwood Re Ltd ("Beechwood").  The co-conspirators established Beechwood with the objective of entering into one or more reinsurance treaties with insurance companies, so that they could take control of reinsurance trust fund assets and use those assets to benefit Platinum, thereby enriching Platinum's and Beechwood's owners.

6.    On September 17, 2016, the *Wall Street Journal* reported ("9/17 *WSJ* Article")[1] that "[f]or years, Platinum had little success attracting insurance-company money and considered starting a reinsurer to do so . . . .  It didn't proceed, but after Feuer and Taylor opened Beechwood Re, more than 40% of Beechwood's equity was held by family-member trusts of Platinum's founders as well as by a former Platinum employee."

7.    Also reported in the 9/17 *WSJ* Article was that "Feuer had long known some at Platinum, whose executives were active in the same religious community on New York's Long

---

[1] *Adviser With Ties to Hedge Fund Platinum Put Client Funds in It*, WSJ, Sept. 17, 2016, available at http://www.wsj.com/articles/adviser-with-ties-to-hedge-fund-platinum-put-client-funds-in-it-1473997753. *See* Exh. H.

2

Island.  He and Huberfeld served at a charity together, and Feuer's sister went to the same school as Platinum co-founder Mark Nordlicht . . . ."  The ties between them ran deep.

8.    At the time that the co-conspirators established Beechwood, Huberfeld already had a criminal background, and Nordlicht had an entrenched reputation for making speculative investments with unsavory companies. Platinum's funds likewise enjoyed the same disreputable reputation as its founders.

9.    Upon information and belief, the co-conspirators agreed that (a) Platinum's founders would own a significant part of Beechwood and provide it with capital and employees to further the scheme, and (b) Platinum's control over Beechwood would remain a closely-guarded secret, while Feuer, Taylor and Levy served as the front men.

10.   In 2013, Claimants went to the reinsurance marketplace to seek reinsurance for certain long term care blocks of business.  Several reinsurers were interested in the business, including Beechwood.

11.   At the time, Beechwood was a start-up company with no other reinsurance business.  Pursuant to its founders' fraud scheme, Beechwood sought Claimants' business based upon the sterling reputations of Feuer and Taylor. Accordingly, Feuer and Taylor made numerous verbal and written promises to Claimants indicating that they would expertly administer policy claims and prudently invest trust assets for the protection of policyholders and Claimants. Relying upon Respondent's representations, and the representations from Respondent's paid advisors and professional consultants, Claimants selected Beechwood as their reinsurer.

12.   As part of their design to induce Claimants to enter into reinsurance agreements with Beechwood, representatives of Beechwood repeatedly told Claimants that Beechwood was

3

owned by Feuer and Taylor, who represented themselves as two upstanding professionals, who capitalized Beechwood with family money and the fortunes earned during their professional careers, with a third principal, David Levy.

13.    Due to Feuer and Taylor's representations, it was carefully and intentionally hidden from Claimants for over two years that Beechwood was actually largely capitalized with a $100 million note from a series of trusts owned or controlled by Nordlicht, his family and other confederates. In fact, Claimants were only made aware of this after (a) Huberfeld was arrested, (b) Claimants commenced an audit and investigation of the trusts, (c) the Platinum-Beechwood alliance received scrutiny in the *Wall Street Journal* and other publications, and (d) repeated requests for information from the New York State Department of Financial Services.

14.    During a series of meetings in late 2013, when Claimants were selecting a reinsurer, Beechwood consistently misrepresented Platinum employees as being senior officers of Beechwood. As Claimants later learned, every single purported senior officer of Beechwood was actually an employee of Platinum, with only one exception other than Feuer and Taylor.

15.    Moreover, numerous individuals who would work for Beechwood after Claimants entered into the reinsurance agreements, including employees who directed Claimants' reinsurance trust assets, were former Platinum employees, Platinum employees seconded to Beechwood from Platinum, or relatives of the co-conspirators. For example, Huberfeld's nephew, David Levy, Huberfeld's son, and Huberfeld's son-in-law all held positions at Beechwood at some time. Until very recently, Beechwood's Chief Investment Officers were all former Platinum employees. Beechwood's Chief Underwriting Officer was a Platinum secondment.

16.     The substantial overlap between the workforces of Beechwood and Platinum hidden from Claimants enabled the Respondent and their co-conspirators to invest reinsurance trust assets in Platinum and Platinum-related entities, without any scrutiny from other senior level executives who might otherwise question such transactions.

17.     During the negotiation of the reinsurance agreements, Feuer and Taylor advised Claimants that there was a $100 million demand note capitalizing Beechwood. Despite Claimants requests that Beechwood disclose the identity of the backers of the demand note, Beechwood refused, citing "confidentiality agreements."

18.     Unbeknownst to Claimants until very recently, those investors were the founders of Platinum and trusts in the names of their families and confederates.

19.     The parties entered into the reinsurance agreements in February 2014 ("Reinsurance Agreements"). According to the 9/17 *WSJ* Article, Feuer and Taylor contacted Huberfeld and Nordlicht within ten minutes of the arrival of the reinsurance trust funds at Beechwood upon the closing of the transaction.[2] The scheme to attract institutional investors in the Platinum funds had succeeded: Claimants gave Beechwood the keys to a $550 million reinsurance trust, without ever suspecting that they were in reality doing business with Platinum.

20.     After entering into the Reinsurance Agreements and taking control of the trust assets, Beechwood, which owed fiduciary duties to Claimants, immediately began using the trust funds to aid Platinum. Among other things, Beechwood (a) invested directly in the Platinum funds, which would help Platinum meet investor redemption demands in further aid of the Platinum fraud scheme; (b) entered into transactions with known criminals who were friends and

_____

[2] "Less than 10 minutes after Beechwood received word that money for its first transaction had arrived, Beechwood's founders notified Nordlicht and Huberfeld, documents reviewed by the Journal show." *See 9/17 WSJ* Article.

5

associates of Huberfeld and Nordlicht; and (c) loaned money to or entered into other transactions with at least a dozen entities controlled by Platinum that any reasonable investment manager would pass on because they were too risky for reinsurance trusts. Indeed, these transactions were in violation of state laws pertaining to the investment of reinsurance trust assets, as well as the express terms of the Reinsurance Agreement's investment guidelines. Collectively these transactions accounted for more than $150 million of the trust assets.

21.     Shortly after effectuating the Reinsurance Agreements, Platinum also proceeded to use Beechwood as Platinum's piggybank. For example, throughout 2014, Beechwood made short-term loans to an investment company owned by Platinum, without having those loans valued and rated as required by the Reinsurance Agreements.

22.     Under the Reinsurance Agreements, Beechwood is required to submit quarterly reports that demonstrate the actual value of assets in the reinsurance trusts. The Reinsurance Agreements also required that non-conventional investments such as loans and real estate, among others, be independently valued and independently rated. If the assets in the trust fell below a certain amount, Beechwood was required to top up the trusts with its own funds. If the assets in the trust exceeded that amount, Beechwood could take surplus amounts as profits.

23.     In order to conceal their fraudulent scheme, Beechwood submitted quarterly reports that contained inflated, and in some cases actually fraudulent, valuations. Respondent then used these erroneous valuations of trust assets to support its removal of $134 million from the trusts as purported "surplus." However, unknown to Claimants at the time, the trusts were undervalued at all times Beechwood submitted reports, or, given the facts and circumstances of many trust investments, valuations could not be verified sufficiently to allow any surplus withdrawals.

6

24.      In mid-to-late 2014, Claimants learned that Beechwood had invested trust assets in the Platinum funds, and brought to Feuer and Taylor's attention that these investments were not suitable.  Feuer and Taylor represented to Claimants that these improper investments were the work of Levy (Huberfeld's nephew), who had left Platinum to become the Chief Investment Officer ("CIO") of Beechwood.  They conceded that these investments were not suitable for the reinsurance trusts.  Around December 2014, they also told Claimants that Levy had left Beechwood.  Levy immediately returned to Platinum, after having breached his fiduciary duties by serving Platinum's interests while he was Beechwood's CIO.

25.      Respondent also told Claimants that the reinsurance trusts' Platinum investments would be unwound and that, by dint of Levy's resignation, Beechwood's ties to Platinum had been cut.  That statement was false because, unknown by Claimants until recently, numerous Platinum employees still worked directly for Beechwood; Platinum routinely consulted with Beechwood; and Huberfeld, Levy and Nordlicht still owned 40% of Beechwood, between themselves and their family trusts.  These significant ties between Beechwood and Platinum meant that Platinum could influence Beechwood's operations, including the investment of reinsurance trust assets.  Platinum continued to do so even after Levy returned to Platinum.

26.      Throughout the life of the reinsurance relationship, Respondent and their paid advisors and consultants submitted false valuation reports to Claimants purporting to show that the trusts' Platinum-related investments were performing well and that the reinsurance trusts were adequately funded.

27.      During this time, Beechwood continually hid its deep ties to Platinum, and removed $134 million from the trusts as purported "surplus," while continually misrepresenting to Claimants that Beechwood would unwind investments made to Platinum-related entities.

28.     In fact, Beechwood did not unwind the trusts' Platinum investments as promised, but rather continued to make massive additional Platinum investments.  This continued even after Huberfeld was arrested in June 2016.

29.     Beechwood and its paid advisors and consultants also continued to submit false quarterly valuations to Claimants in order to declare surpluses and support further depletion of the trusts.

30.     Moreover, Beechwood continued to hide its true connections to Platinum, including the fact that Huberfeld, Nordlicht and Levy owned 40% of Beechwood and that its professional staff, including those in charge of investments, were serving Platinum.

31.     The scheme to defraud Claimants began to unravel on June 8, 2016, when Huberfeld was arrested and charged with bribing a union official to make a $20 million investment in one of Platinum's funds.  In connection with Huberfeld's arrest, Beechwood's offices were raided by the FBI.  Moreover, and unbeknownst to Claimants, it was reported by the media at that time that Huberfeld maintained an office at Beechwood.

32.     Over the summer of 2016, the *Wall Street Journal* and other publications exposed Beechwood's deep ties to Platinum, and these publications reported that Huberfeld and Nordlicht used Beechwood to attract institutional investors for the Platinum funds.  The United States Attorneys for both the Eastern and Southern Districts of New York are currently investigating Platinum and its founders.

33.     Claimants, alarmed by the trusts' continued deep investments with Platinum-related entities, the raid of Beechwood's offices, Huberfeld's arrest, and media reports concerning the same, began their own audit of the trust's investments with the aid of counsel and an independent financial consultant, Cornerstone Research ("Cornerstone").

34.     The audit and investigation, which is ongoing, revealed that Beechwood, the Respondent and their paid advisors and consultants overvalued the trusts' assets and that, as a result of the co-conspirators' self-dealing, conflicts of interest and non-arm's length transactions, many assets had been improperly valued.

35.     The audit and investigation also revealed that Respondent and their co-conspirators engaged in a continuous stream of misrepresentations since the inception of the relationship, concerning Beechwood's ownership structure, the nature and value of assets in the trusts, Beechwood's relationship with Platinum, and Respondent's knowledge of, and participation, in the fraud.

36.     On September 29, 2016, state insurance departments in New York (where BCLIC is domiciled) and Indiana (where WNIC is domiciled), after a lengthy investigation of the reinsurance trusts (in which Beechwood and two of its law firms participated), concluded that many assets in the trusts were "not compliant" with the conservative investment guidelines prescribed by applicable state law.

37.     The state regulator in New York gave Claimants ten days to bring the trust into compliance, but that will not be possible given the structure of the assets and, Beechwood advised that it would take months if not years to unwind all of the trusts' Platinum-related investments.

38.     As a result of Beechwood's material breaches of the Reinsurance Agreements, as well as the regulatory directives Claimants received from two state insurance departments, Claimants initiated the termination of the reinsurance agreements on September 29, 2016. At the same time, Claimants advised the trustee, Wilmington Trust, to return all trust assets to Claimants as required by the relevant agreements. Claimants also initiated the process to take

9

control of all claims administration and commenced arbitration against Beechwood seeking money damages and emergent relief enforcing Claimants' audit and inspection rights under the relevant terms of the Reinsurance Agreements.

39.    As stated in the 9/17 *WSJ* Article, "Platinum's fund investors have been largely concentrated in a tight-knit group of observant Jewish businesspeople.  Exposure to Platinum reached a far wider realm as a result of Beechwood's having directed insurance-client money into Platinum funds and related investments."  The co-conspirators' plan to bring institutional investor money into Platinum succeeded, by having Feuer and Taylor serve as the front men to induce insurance companies to unwittingly invest in Platinum.  But the co-conspirators' success has caused immense damage to Claimants.

40.    According to the 9/17 *WSJ* Article, "Since early 2014, Beechwood has put more than $200 million of client money in Platinum-linked investments, according to public filings and people familiar with the matter."  The 9/17 *WSJ* Article reported that this $200 million came from Claimants and another insurance company, Senior Health Insurance Co. of Pennsylvania ("SHIP"), which was formerly affiliated with Claimants before being spun off years ago.

41.    Also according to the 9/17 *WSJ* Article, "The CEO of Beechwood, Mark Feuer, said he didn't tell SHIP and other clients about his firm's ties to Platinum because the ownership stakes were passive and didn't come with a management role."  But the real reason that Feuer did not reveal Beechwood's ties to Platinum is that no insurance company would invest in Platinum or enter into a reinsurance agreement with a reinsurer tied to Platinum, and Feuer and Taylor were in cahoots with Platinum to bring institutional investor money to Platinum without the institutional investors' knowledge of Beechwood's Platinum ties.

10

42.     That is, Beechwood's massive and risky investments with reinsurance trust fund assets in Platinum and Platinum-related entities was not some grand coincidence, or the result of an analytical process in which investment professionals decided that, among many thousands if not millions of different investment opportunities available to the reinsurance trusts, investing in Platinum-related companies represented the best and most prudent investments. To the contrary, Beechwood's massive and risky investments with Platinum and Platinum-related entities was the *goal* of the fraud scheme, which was to bamboozle institutional investors like Claimants out of their money by tricking them into indirectly investing with Platinum.

43.     Claimants now bring this arbitration to recover damages against Respondent for their participation in the fraud scheme.

## THE NEED FOR EMERGENCY ARBITRAL RELIEF

44.     BCLIC and WNIC require emergent relief to protect themselves and their thousands of policyholders from further damage by Beechwood. Specifically, Claimants seek an award under Rules 37 and 38 of the American Arbitration Association Commercial Arbitration Rules and Mediation Procedures ("AAA Commercial Rules") mandating that Beechwood open its books and records to inspection by BCLIC and WNIC and provide BCLIC and WNIC with the documents and information set forth in Exh. A hereto. BCLIC and WNIC are entitled to this relief for multiple reasons.

45.     *First*, BCLIC and WNIC have extensive auditing rights under the Reinsurance Agreements. *See* Reinsurance Trust Agreements §§ 3.4, 4.5(b). Those extensive auditing rights must be subject to a "liberal construction" by the arbitrator. *Id.*, § 10.1(b). Here, given these extraordinary circumstances, and amounts at issue, no reason exists to deny Claimants their contractual audit rights.

11

46.     *Second*, the emergency arbitrator is empowered to provide this relief under several AAA Commercial Rules, which are incorporated into the Reinsurance Agreements. R-38 allows for broad emergency relief, and R-37 specifically vests the arbitrator with authority to "take *whatever* interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property." (emphasis added). A full audit of the Trusts will aid Claimants' efforts to protect and conserve assets for the benefit of their policyholders. Moreover, R-22 permits the arbitrator to order extensive discovery in large, complex cases; thus, arbitrator can order the audit and inspection of records within the context of its plenary authority to control discovery.

47.     *Third*, the arbitration clause itself grants the arbitrator with vast authority to control the proceedings. *Id.* at § 10.1(e) (the arbitrator "shall not be bound by legal rules of procedure and may receive evidence in such a way to do justice between the Parties."). The emergency arbitrator is expressly permitted to craft the proceedings as justice requires. Here, justice requires, at minimum, a complete and thorough audit of Beechwood so that the full extent of its wrongdoing can be swiftly uncovered.

48.     Significantly, BCLIC and WNIC need the requested award in order to fully and accurately report to their respective state insurance regulators in New York and Indiana the level of harm that Beechwood inflicted upon their closely-regulated Trust assets. Those regulators have *already* determined that many assets in the Trust are not qualified assets, and have taken action requiring Claimants to act expeditiously. In addition, the award is essential to the ability of CNO Financial Group, Inc. ("CNO"), Claimants' parent holding company, to fully and accurately report this harm to its public shareholders.

49.    BCLIC and WNIC will also require all of the requested documents and information because they have terminated the Reinsurance Agreements and need all documents pertaining to Trust assets, so they can appropriately manage them. Finally, without this relief, it is exceedingly unlikely that BCLIC and WNIC will be able to take control of this business without incurring further damage to themselves, as well as to their policyholders and to the shareholders of their parent company

## FACTUAL BACKGROUND

### A.    Origin Of The Reinsurance Agreements.

50.    BCLIC is an insurance company domiciled in New York. WNIC is an insurance company domiciled in Indiana. Both are indirect subsidiaries of CNO Financial Group, Inc. ("CNO"), a publicly traded insurance holding company.

51.    In 2013, BCLIC and WNIC turned to the reinsurance marketplace to explore transferring certain long term care liabilities to a qualified reinsurer. As part of that process, Rick Hodgdon and Michael Kaster of Willis Re Inc. ("Willis Re"), a reinsurance subsidiary of Willis Group Holdings plc, introduced Claimants to Beechwood.

52.    Kaster had formerly worked for CNO companies, and thus he had some familiarity with the lines of business to be ceded. Kaster was known to be a credible insurance professional. Hodgdon purportedly joined Beechwood while Claimants were evaluating competing reinsurance proposals. However, in another recent admission of truth, Respondent admitted that Hodgdon was actually a Platinum employee seconded to Beechwood during this time period.

53.    At that time, Beechwood was a new reinsurance company with no existing business. Feuer and Taylor advised Claimants that Beechwood was founded by two reputable businessmen, attorney Feuer, who had been the Chief Executive Officer of Marsh USA Inc., and

13

Taylor, who at different times had been an executive of Marsh & McLennan and Chief Operating Officer for Merrill Lynch Wealth Management's Private Banking and Investments Group.

54.     Beechwood's pitch for BCLIC's and WNIC's business was twofold. *First*, Feuer and Taylor represented that they had strategies to more effectively manage claims, which they learned from their stints at prior companies. *Second*, they were experienced investment professionals, who would bring superior management of trust assets, allowing for greater returns.

55.     Beechwood's written materials, which were prepared by Respondent, promised its investment team had "extensive experience" with "strong risk management processes." These written materials also stated, "Beechwood Re Must Deploy a Responsible Investment Strategy Capable of Generating Adequate Returns."   The written materials also promised that, "Beechwood Re's management team has extensive experience utilizing credit-based investment strategies to generate returns while using strong risk management processes."

56.     Respondent recognized that Claimants would not select Beechwood as reinsurer unless it made "responsible" investments, as the reinsurance trust funds would secure policyholder claims.

57.     Respondent repeatedly advised Claimants, verbally and in writing, that the reinsurance trust assets would be managed responsibly, with proper risk management, for the benefit of protecting policyholders.

58.     Between improving policyholder morbidities and increasing investment returns, Beechwood, under the guidance of these seasoned professionals, represented that it would be able to effectively manage the transferred blocks of business.

59.     In 2013, Feuer and Taylor, on behalf of Beechwood, sent Claimants a document titled "Beechwood Re/Discussion Document/June 2013."   In that document, Beechwood

14

represented to Claimants that Beechwood "is capitalized with over $100MM in capital, with access and intent to fund up to $500 million additional over coming years." Respondent wanted Claimants to believe that Beechwood brought to the table significant capital to shoulder the burden and risk of a reinsurance relationship.

60.     Throughout June, July, August and September of 2013, Feuer and Taylor represented to Claimants that Beechwood was owned by just three individuals, with no connection to any private equity investors, and that they had initial "non-redeemable capital" of over $100 million.

61.     In November 2013, Beechwood sent a team to meet with Claimants.  In connection with that meeting, Hodgdon, at the direction of Respondent, sent Claimants an email dated November 5, 2013, identifying the representatives from Beechwood who would be attending the meeting.  Hodgdon, by this time, had left Willis Re to work for Platinum, but Respondent deceitfully advised Claimants that Hodgdon worked for Beechwood.

62.     Beechwood, through Hodgdon, advised Claimants that the following Beechwood personnel would join the meeting:  Feuer and Taylor; Will Slota, who was designated as the "COO" of Beechwood; Paul Poteat, who was designated as the "CTO" of Beechwood; David Ottensoser, who was designated as the "General Counsel" of Beechwood; Dan Small, who was designated as the "Senior Secured Collateralized Loans PM" of Beechwood; and David Leff, who was designated as the "US Fixed Income PM" of Beechwood.

63.     In fact, unknown to Claimants but now recently discovered, Slota, Poteat, Ottensoser and Small *were at that time employees of Platinum, not Beechwood.*  Only Leff appears to have been an actual Beechwood employee.  Hence, Beechwood misrepresented to Claimants that individuals who were employed by Platinum were actually Beechwood

employees.  Respondent were aware of this misrepresentation at the time it was made, directed it and intentionally concealed it.

64.      As discussions between Beechwood and Claimants progressed in November 2014, Claimants began their due diligence on Beechwood.  Claimants made several inquiries about Beechwood's ownership structure and capitalization.  Beechwood repeatedly told Claimants that Beechwood was mostly owned by Feuer and Taylor, as well as Levy, and that they had capitalized Beechwood with their families' investments and with monies earned during their successful careers.

65.      Claimants recently learned that those representations were false.  Beechwood was in substantial part owned by a series of family trusts owned by individuals other than Feuer and Taylor.  When Feuer and Taylor asked Beechwood about these family trusts, Beechwood refused to identify the investors, citing to "confidentiality agreements."  Feuer and Taylor also represented to Claimants that these minority interests represented purely "passive" investments.

66.      Unknown to Claimants at that time, but recently discovered, Beechwood was in substantial part owned by a series of family trusts in the names of Huberfeld and Nordlicht, as well as their family members (including spouses and children).  Levy and his family trusts owned another 5%.  Together, Huberfeld and Nordlicht controlled over 35% of Beechwood's equity, and with Levy's interest, they controlled 40%.

67.      Upon information and belief, Feuer, Taylor, Huberfeld, Nordlicht and Levy formed Beechwood for the purpose of entering into reinsurance agreements in which they would take control of trust assets and use them to benefit Platinum and enrich themselves.  In fact, according to published reports, Feuer and Taylor notified Huberfeld and Nordlicht that the trust

assets were available to invest less than ten minutes after receiving the news that the funds had arrived.

68.     Most institutional investors like insurance companies would not ordinarily invest in Platinum, which made investments in unscrupulous companies and which engaged in unscrupulous acts.

69.     Seeking additional investments from institutional investors to further fund their fraud scheme, Huberfeld and Nordlicht sought conspirators to form a reinsurance or other seemingly legitimate company for the purpose of obtaining large amounts of money to pilfer for the benefit of Platinum and the co-conspirators.

70.     Ultimately, they found Feuer and Taylor, two professionals with excellent reputations who could serve as the front men for a purported reinsurance company and which could, through reinsurance agreements, obtain control of trust assets for the benefit of furthering the Platinum fraud scheme and enriching scheme participants.  That company was Beechwood.

71.     While Feuer and Taylor were nominally in charge of Beechwood, it was actually controlled by Platinum, its founders and its employees, including Levy, who left Platinum to become the CIO of Beechwood, and then returned to Platinum.  Beechwood proceeded to use the reinsurance trust assets to benefit Platinum.

**B.     The Reinsurance Agreements.**

72.     BCLIC and WNIC are cedents under two reinsurance agreements with reinsurer Beechwood.  Under the Reinsurance Agreements (copies of which are attached hereto as Exhs. B and C), BCLIC and WNIC transferred certain long term care liabilities to Beechwood and paid Beechwood over $42 million as a negative ceding commission (that is, BCLIC and WNIC paid Beechwood $42 million to enter into the Reinsurance Agreements).

73.     Beechwood assumed control over claims administration, and BCLIC and WNIC deposited approximately $550 million into reinsurance trusts ("Trusts") to be invested and managed by Beechwood, subject to investment guidelines prescribed by the Reinsurance Agreements and the insurance laws of New York and Indiana.  The assets in the Trusts were intended to serve as reliable (*i.e.*, safe and liquid) collateral for Beechwood's obligations to reimburse Claimants for claims on the transferred liabilities, and for Claimants to obtain reserve credits.

74.     Pursuant to the Reinsurance Agreements, Beechwood was required to deposit assets into the reinsurance Trust accounts with an aggregate fair market value of 102% of the statutorily required reserves (*i.e.*, policy liabilities) as collateral for Beechwood's obligation to pay future claims on the reinsured policies.  For purposes of this calculation, only Trust assets in compliance with the Reinsurance Agreements' investment guidelines qualified as countable. The Reinsurance Agreements define Qualifying Trust Assets to include cash, certificates of deposit, or specific kinds of investments permitted under New York and Indiana insurance laws, not including investments in which either party or its affiliates has an interest, or investments in insolvent entities.

75.     Thereafter, the Reinsurance Agreements empower Beechwood to direct the Trustee to invest or reinvest the Trust assets in accordance with the Reinsurance Agreements' conservative investment guidelines.

76.     The Reinsurance Agreements require Beechwood to top-up the Trusts in the event that the market value of the assets in the Trusts fall below 102% of the amount of the statutory liabilities ceded to Beechwood.  Beechwood's promise to preserve the value of, and properly and

prudently manage, the Trust assets was essential to BCLIC's and WNIC's agreement to reinsure the transferred business with Beechwood.

77.     The Reinsurance Agreements also allow Beechwood to remove from the Trusts for their benefit money as surplus if the Trusts' assets are greater than a threshold amount.

78.     The Reinsurance Agreements require Beechwood, at the end of each quarter, to provide written reports to BCLIC and WNIC that describe the fair market value of qualifying Trust assets.  The reports must contain supporting detail and other information necessary for BCLIC and WNIC to verify that the assets are Qualifying Trust Assets and that the investment guidelines have been followed.

79.     If the aggregate fair market value of qualifying Trust assets is determined to exceed 102% of the statutorily required reserves at the end of a quarter and the aggregate fair market value of the assets in the supplemental Trust accounts exceeds 5% of the Trust amount and above the "Supplemental Trust Amount," the Reinsurance Agreements provide that Beechwood may ask BCLIC and WNIC to withdraw the excess amounts.

80.     If, however, the aggregate fair market value of the qualifying Trust assets is determined to be less than 102% of the statutorily required reserves at the end of a quarter, then Beechwood is required to make deposits into the Trusts to bring the aggregate fair market value of qualifying Trust assets to no less than 102% of the statutorily required reserves.

81.     Thus, to determine if Beechwood needed to add money to the Trusts or could withdraw money from the Trusts, the Reinsurance Agreements provide that Beechwood would provide quarterly reports of assets in the Trusts, with proper valuations.

82.     The Reinsurance Agreements also establish supplemental Trust accounts to be maintained as overcollateralization of Beechwood's obligations.  Under the Reinsurance

19

Agreements, the supplemental Trusts must contain assets with an aggregate fair market value equal to the greater of 5% of the Trust Amounts and the Supplemental Trust Amount. Both the BCLIC and the WNIC supplemental Trust accounts are governed by investment guidelines very similar to or the same as the investment guidelines governing the WNIC Trust.

83.     With respect to the supplemental Trust accounts, Beechwood may ask BCLIC and WNIC to withdraw assets from the supplemental Trusts if, at the end of a quarter, the market value of the assets in the supplemental Trusts exceed the greater of 5% of the Trust amounts and the Supplemental Trust Amounts, and the value of Qualifying Trust Assets is determined to exceed 102% of the statutorily required reserves. If, however, the market value of the assets in the supplemental Trusts are less than the greater of 5% of the Trust amounts and the Supplemental Trust Amounts at the end of a quarter, then Beechwood is required to make deposits into the supplemental Trusts to bring the aggregate fair market value of supplemental Trust assets to no less than the greater of 5% of the Trust amounts and the Supplemental Trust Amount.

**C.     In 2014, BCLIC and WNIC Object To Certain Investments, Including Transactions With Suspect Individuals And With Platinum.**

84.     As Levy began investing the Trust assets in 2014, BCLIC and WNIC began receiving quarterly reports from Beechwood. Upon receiving these reports, BCLIC and WNIC began questioning a number of the investments into which Beechwood directed Trust assets. Among other things, BCLIC and WNIC learned that Beechwood:

- purchased a loan to George Levin, who was a principal in the Rothstein Rosenfeldt Adler PA Ponzi scheme (the "Rothstein Ponzi scheme"). Platinum apparently obtained a large judgment against Levin, forcing him into bankruptcy.

BCLIC and WNIC did not know at the time of the 2014 quarterly reports, and just recently learned, that Beechwood purchased the loan to Levin from Platinum;

- loaned money to a Platinum-controlled entity which was run by Moshe Oratz and Aaron Elbogen. Oratz was jailed in connection with a gambling ring, and Elbogen settled charges brought by the Securities Exchange Commission ("SEC") over fraudulent trade executions; and

- loaned money to Cashcall Inc., which was sued by the Consumer Financial Protection Bureau and 17 states for violating consumer protection and usury laws providing interest-rate caps.

85.    These investments were objectionable to Claimants because they are not suitable investments for reinsurance trust funds, which should be conservative investments to ensure that there are sufficient assets to pay policyholder claims.  Additionally, for reputational reasons, Claimants could not possibly be seen as doing business with such disreputable firms and individuals.

86.    In addition, Beechwood had directly invested tens of millions of dollars of Trust assets in certain of Platinum's funds.  At the time, the Platinum funds were known to make aggressive investments in distressed and disreputable companies, and such investments were not consistent with the Reinsurance Agreements' investment guidelines or with Claimants' business strategies and reputation.

87.    BCLIC and WNIC also raised questions concerning how Beechwood characterized and valued assets in the Trusts.  For example, Beechwood made numerous investments of Trust assets in notes collateralized not by assets, but rather by the borrowers' equity or other borrowers' debt instruments.  Yet, Beechwood inflated the value of these tenuous

forms of collateral to conclude that the Trusts were over-collateralized.  In addition, Beechwood had invested assets in risky businesses, including start-up and severely distressed companies.

88.     At no time during all of the 2013 and 2014 discussions between Claimants and Respondent, did anyone advise Claimants of the significant interests that Platinum and its principals, Huberfeld and Nordlicht, had in Beechwood, that Huberfeld had an office at Beechwood, that Huberfeld's son-in-law worked at Beechwood affiliate and asset manager, B Asset Manager ("BAM"), or that Huberfeld's son interned at BAM.  Nor did Feuer and Taylor advise Claimants of the significant number of Platinum employees who worked for Beechwood, who were seconded to Beechwood, or who were advising Beechwood.

89.     Instead, Respondent, and others at Beechwood, kept all of these connections secret and represented to Claimants that these high-risk investments were appropriate and properly valued.

### D.     The Black Elk Investment; Levy Leaves Beechwood And Returns To Platinum.

90.     According to a special report by Reuters,[3] Platinum obtained the majority interest in Black Elk Energy LLC ("Black Elk"), a Houston-based company that purchased unproductive oil wells, sometime after 2009.  In 2012, an explosion on a Black Elk rig off the Louisiana coast killed three workers, seriously injured another three workers, and spilled oil into the Gulf of Mexico.  Prior to this incident, the rig received hundreds of safety citations from the U.S. Department of the Interior's Bureau of Safety and Environmental Enforcement, and after an investigation, the same agency concluded that the safety culture on the rig was "poor at best."

---

[3] See Lawrence Delevingne, *The Top-Performing Hedge Fund Manager That's Too Hot For Big Money To Handle*, Reuters, Apr. 13, 2016, available at http://www.reuters.com/ investigates/special-report/usa-hedgefunds-platinum. *See* Exh. 1.

Eventually, the U.S. Department of Justice announced criminal charges against Black Elk. Black Elk was forced into bankruptcy in August 2015.

91.    In or around February, 2014, immediately upon closing the transaction, however, before Black Elk entered bankruptcy, Beechwood invested $27 million of Trust assets in Black Elk high-yield junk bonds. Also before going into bankruptcy, however, Black Elk sold its main assets to a third party for $149 million. The majority of the proceeds from this sale went to a subsidiary of Platinum, and not to the senior creditors that included Beechwood. Black Elk's remaining assets were also sold to a different Platinum subsidiary. Not long after, Black Elk's secured creditors demanded to know how, in light of their first priority status, Platinum was paid from the asset sale before payment was made to them.

92.    In fact, Platinum managed to subordinate the interests of the secured creditors through trickery. Just prior to the first asset sale, Platinum used a consent solicitation to ask bondholders of $150 million of Black Elk's high-yield junk bonds to approve a measure that would let Platinum receive proceeds of the asset sale ahead of bondholders and other secured creditors. The bondholders approved this absurd request – to strip themselves and secured creditors of their priority – because of varying methods of control Huberfeld and Nordlicht's fund exerted over 70% of the bonds. Levy, then at Beechwood, exploited his role as Beechwood's CIO to approve the consent on behalf of the junk bonds Beechwood had purchased with Respondent' Trust assets (in addition to bonds Beechwood had purchased while managing others' funds).

93.    In short, Beechwood, in the person of David Levy, voted the Beechwood-purchased bonds, including the Trusts' bonds, against the interests of the Trusts and Beechwood, and in favor of subordinating them to Platinum's interests, even though this vote meant that the

Trusts' bonds would be exposed to greater risk of loss, because all the value of Black Elk's assets was paid to Platinum.

94.     Feuer and Taylor offered no justification for the vote.  Instead, they pinned all of Beechwood's actions to assist Platinum on Levy.  Levy left Beechwood to immediately return to Platinum, where he and others could continue to direct the Trusts' investments through their control of numerous Platinum employees who worked at Beechwood, who were seconded to Beechwood, or who were consulting with Beechwood employees on a regular basis.

**E.    Feuer and Taylor Promise To Cut The Ties Between Beechwood And Platinum, But They Do Just The Opposite.**

95.     In late 2014, Feuer and Taylor promised Claimants that Beechwood would  begin to unwind Beechwood's significant investments in companies controlled by Platinum.  Claimants were thus led to believe that Beechwood would take steps to divest itself of such investments. Beechwood partially redeemed its direct investments in the Platinum funds, but found other ways to support Platinum, namely, by investing in companies that Platinum owned or controlled.

96.     To lull Claimants into a false sense of security, Feuer and Taylor represented to Respondent in late 2014 that Beechwood's ties to Platinum had been "cut" with Levy's departure.  Thus, Claimants were led to believe that Beechwood, under the supervision of Feuer and Taylor and a dedicated team of investment professionals, would unwind and properly value the questionable investment of Trust assets, and replace such investments with suitable investments.

97.     That did not occur.  According to the 9/16 *WSJ* Article, Beechwood has invested more than $200 million of client funds with Platinum-linked entities since 2014.  And Beechwood made investments with Trust assets throughout 2015 and 2016 totaling tens of

millions of dollars in Platinum-related companies, including after Huberfeld was arrested. In 2016, Beechwood again invested Trust assets directly into Platinum's funds.

98.    Moreover, as Claimants learned recently, Beechwood hid troubling facts concerning Huberfeld's and Nordlicht's involvements with Beechwood. Huberfeld and Nordlicht owned much of Beechwood's equity, and without their investments, Beechwood would not have had the capital to top-up the Trusts, as required by the Reinsurance Agreements, in the event of a shortfall. Beechwood never disclosed this conflict to Claimants.

99.    Instead, Beechwood advised Claimants in 2013, when Claimants were in the process of selecting a reinsurer, that it had a demand note in the amount of $100 million for extra security in case a top-up of the Trusts was necessary, and access to an additional $500 million in capital. As Claimants recently learned, however, the issuer of that note was none other than Nordlicht, and trusts created substantially for his benefit and related parties.[4]

100.    And, in May 2014, the demand note was reduced, without explanation or disclosure, to $25 million, an amount wholly insufficient given the magnitude of the Trusts' assets then. Moreover, the additional $500 million in capital simply does not exist.

101.    Beechwood recently has advised Claimants it is about to run out of cash and that Feuer and Taylor will have to fund operations with their own money. Feuer and Taylor have complained about the strain of that economic burden, and are now seeking additional surplus funds from the Trusts to fund Beechwood's operations. Thus, Feuer and Taylor's representations to Claimants in 2013 concerning its access to capital were false and misleading.

_____

[4] Some portion of the Note was also guaranteed by trusts in the name of David Bodner and his family members. Bodner, who also has a criminal record, had long and deep ties to Huberfeld and Nordlicht.

F.      **Beechwood's Significant Ties With Platinum.**

102.    In addition to Beechwood being owned in substantial part by Platinum's principals (and their trusts), Huberfeld having an office at Beechwood, Beechwood employing Huberfeld's nephew (Levy) as its CIO, and Huberfeld's son and son-in-law working for Beechwood and BAM, many of Platinum's employees (in addition to Levy) left Platinum to work for Beechwood, or consulted with Beechwood about significant matters.  For example:

    a.      Rick Hodgdon was seconded to Beechwood by Platinum and serves as Beechwood's Chief Underwriting Officer;

    b.      Daniel Saks, a former Platinum employee, served as BAM's CIO after Levy "resigned";

    c.      Naftali Manela, an employee of Platinum, provided consulting services to Beechwood related to general operations; and

    d.      Eli Rakower, an employee of Platinum, provided consulting services to Beechwood related to interaction with valuation firms that would value Trust assets.

103.    The individuals set forth above were either aware that Platinum was engaging in a fraud against Claimants, or were willfully blind to it, and in any event were sent to work at Beechwood, or consulted with Beechwood, on Platinum's behalf, to facilitate the fraud.

G.      **Huberfeld Is Arrested; Nordlicht Is Investigated For Fraud; The Platinum Funds Begin Liquidating.**

104.    According to published reports, on June 8, 2016, the U.S. Attorney for the Southern District of New York arrested Huberfeld and announced that criminal charges were

26

being brought against him and Platinum in connection with bribing a union official to make a $20 million investment in a fund owned and operated by Platinum.[5]

105.     Both Huberfeld and Platinum have a long history of unscrupulous conduct.  In 1992, for example, Huberfeld pled guilty to a misdemeanor for sending an imposter to take his Series 7 brokerage licensing exam.[6]  He was sentenced to two years' probation and paid a substantial fine to the SEC.[7]  Just a few years later, in 1998,  Huberfeld and another co-founder of Platinum, David Bodner (who is also one of the investors in Beechwood through his participation in the $100 million capitalization), settled civil allegations that they sold more than 513,000 shares of restricted stock in a particular company.[8]  Huberfeld made an even larger payment to the SEC, in addition to the fine imposed on his then-fund.[9]

106.     Several years later, in 2012, Platinum and Nordlicht's other fund, Centurion, entered into a sizeable settlement with the Chapter 11 Trustee of the Rothstein Ponzi scheme in relation to fraudulent transfers made to the funds.[10]  And Platinum's subsidiary, BDL Manager,

---

[5] *See* Jody Godoy, *NYC Fund Manager, Union Head Accused of $20M Fraud*, Law360, June 8, 2016, available at http://www.law360.com/articles/804854/ nyc-fund-manager-union-head-accused-of-20m-fraud. *See* Exh. J.

[6] *See* Zeke Faux, *No Blow Up Is Big Enough to Tarnish Platinum Partners' Returns*, Bloomberg, Oct. 21, 2015, available at http://www.bloomberg.com/ news/articles/2015-10-21/no-blow-up-is-big-enough-to-tarnish-platinum-partners-returns. *See* Exh. K.

[7] *Id.*

[8] *See* Lorena Mongelli and Bruce Golding, *Hedgie Accused of Bribing Union Boss Has Criminal Past*, NY Post, June 8, 2016, available at http://nypost.com/2016/06/08/hedgie-accused-of-bribing-union-boss-has-criminal-past. *See* Exh. L.

[9] *Id.*

[10] *See* Sindhu Sundar, *Fund Managers Put Up $32M To End Rothstein Trustee Claims*, Law360, available at http://www.law360.com/articles/359744/fund-managers-put-up-32m-to-end-rothstein-trustee-claims. *See* Exh. M.

27

entered into yet another settlement with the SEC in 2014 in connection with a scheme to profit from the imminent deaths of terminally ill patients in nursing homes and hospice care.[11] Specifically, BDL Manager's brokers tricked dying patients into providing personal information that the brokers then used to make risky investments in variable annuities, which paid benefits to BDL Manager when the patients died.[12]

107.    Nordlicht, Huberfeld's longtime partner and co-founder of Platinum, likewise has a checkered past.  According to published reports, both Huberfeld and Nordlicht and their wives were sued in connection with the Rothstein Ponzi scheme.  In addition, one of  Nordlicht's previous funds, Optionable Inc., collapsed in a trading scandal in 2007 when another of its co-founders, Kevin Cassidy, was arrested for deliberately misstating the value of natural gas derivatives.[13] Cassidy, who served two prior stints in prison, was sentenced to another 30 months.[14]  When he was released, Platinum hired him as the managing director of Agera Energy, a distressed company that Platinum had taken over and in which David Levy, while serving as Beechwood's Chief Investment Officer, had invested Trust assets in its high-risk debt.[15]

----

[11] *See* SEC Press Release: SEC Announces Charges Against Brokers, Adviser, and Others Involved in Variable Annuities Scheme to Profit From Terminally Ill, Mar. 13, 2014, available at https://www.sec.gov/News/PressRelease/Detail /PressRelease/1370541121951. *See* Exh. N.

[12] *Id.*

[13] *See* SEC Press Release: SEC Charges Banker and Brokerage Executives With Multi-Million Dollar Financial Fraud, Nov. 18, 2008, available at https://www.sec.gov/news/press/2008/2008-274.htm. *See* Exh. O.

[14] *See* Bill Singer, *Commodities CEO Gets 30 Months in Prison in Mark to Market Scheme*, Forbes, Apr. 26, 2012, available at http://www.forbes.com /sites/billsinger /2012/04/26/commodities-ceo-gets-30-months-in-prison-in-mark-to-market-scheme/#62116c652089. *See* Exh. P.

[15] *Id.*

108.    According to published reports, Nordlicht is currently under investigation along with Platinum. On June 22, 2016, the FBI and the U.S. Postal Inspection Service raided Platinum.[16]  According to the *New York Post*, the FBI is "expected to look at Platinum's valuation of its hard-to-value illiquid assets."[17]

109.    According to a July 25, 2016 article in the *Wall Street Journal* ("7/25 *WSJ* Article"),[18] the government has launched a "fraud investigation" against Platinum.  Platinum had for years boasted of its outsized returns on investments, but those returns are likely fictitious and designed to induce others to invest money in the Platinum scheme.

110.    As explained in the 7/25 *WSJ* Article, Platinum began borrowing money to repay investors starting in 2012, when investors began asking for their money back.  The 7/25 *WSJ* Article reported that Platinum has recently suspended all redemptions from its funds and could not commit to investors that the Platinum funds would pay investors "cash matching the full investment gains the firm has reported."  In other words, the money Platinum represented was in the Platinum funds is not actually there.

111.    The government, according to the 7/25 *WSJ* Article, is investigating whether "Platinum had been paying some reported investment gains to existing investors with money from incoming ones."  The 7/25 *WSJ* Article also reported that Nordlicht is a target of the

---

[16] *See* Kaja Whitehouse and Josh Kosman, *FBI Raids Hedge Fund Linked to Union Head's Kickback Probe*, NY Post, June 22, 2016, available at http://nypost.com/ 2016/06/22/fbi-raids-hedge-fund-linked-to-union-heads-kickback-probe/. *See* Exh. Q.

[17] *Id.*

[18] *See* Rob Copeland, *Fraud Probe Ricochets through Platinum Partners, a Hedge Fund With Ties to Jewish Community*, available at http://www.wsj.com/articles/fraud-investigation-ricochets-through-hedge-fund-known-for-ties-to-jewish-community-1469439181. *See* Exh. R.

29

investigation, along with Huberfeld, who, as noted above, has a criminal record and is presently under indictment for bribing a union official.

112.     Due to its ties to Platinum, government agents also raided Beechwood's offices on the morning of Huberfeld's arrest.  As explained in the 7/25 *WSJ* Article – but which was news to Claimants at the time of its publication – Huberfeld and Nordlicht had started and funded Beechwood.

113.     According to the 7/25 *WSJ* Article, and contrary to Respondent' assertions preceding the execution of the Reinsurance Agreements that the company was "owned by three individuals," Huberfeld maintained an office at Beechwood and his son and son-in-law worked at a Beechwood affiliate, BAM.  His nephew,  Levy, controlled Beechwood's investments for over a year and funneled Trust assets into numerous Platinum-related schemes, investments and entities.

114.     Claimants would not have entered into the Reinsurance Agreements if they had known of Beechwood's ties to Platinum, Huberfeld and Nordlicht. Indeed, no insurance company would knowingly invest its assets backing policyholder liabilities with such unscrupulous characters, and insurance regulators would not have knowingly permitted insurers to do anything of the kind.

115.     According to the 7/25 *WSJ* Article, Platinum began running out of cash in 2015 as Platinum investors began increasing redemption requests. To fund those redemptions, Beechwood lent money to Platinum and purchased parts of Platinum's portfolio, so that "Platinum ended up owing Beechwood around $70 million."  Beechwood appears to have been funding Platinum's redemptions to defrauded investors who were demanding an exit from Platinum funds.

116.    This is further confirmed by an article appearing in the *New York Observer* on June 23, 2016.[19] The *Observer* reported that Platinum lacked funds in November 2015 to meet redemption demands. The *Observer* reported that the Fruchthandler family (real estate moguls whose holdings include the Woolworth Building) could not redeem $600,000 from the Platinum Funds and filed a complaint with the SEC.

117.    Tellingly, the *Observer* reprinted a letter written by the Fruchthandler family's attorney to the General Counsel of Platinum, David Ottensoser – *the same person Beechwood told Claimants in November 2013 was the General Counsel of Beechwood.* The *Observer* also reported that Platinum could not come up with $7.5 million in November 2015 to satisfy a put to New Mountain Finance Corporation.

118.    Around the same time, in October 2015, New Zealand's Parris Investments Ltd. ("Parris Investments") submitted a redemption request to Platinum, asking for the return of its funds. Platinum failed to return the money to Parris Investments by the end of December, which was the due date specified by the parties' agreement. According to Parris Investments' court filings, Platinum then made a series of promises over the next several months, indicating it would return the funds. It never did, and in July 2016, Parris Investments filed a complaint against Platinum in the Cayman Islands where Platinum is domiciled. A month later, the Cayman Islands judge issued an order that validated concerns about Platinum's inability to repay

_____

[19] *See* Ken Lurson, *Exclusive: Bribe Suspect Huberfeld Accused of Stiffing Previous Platinum Investors*, Observer, June 23, 2016, available at http://observer.com/2016/06/exclusive-bribe-suspect-huberfeld-stiffed-previous-platinum-investors/. *See* Exh. S.

investors.[20] The order turned over the international unit of Platinum's main fund to court-appointed liquidators.

### H.   The Cornerstone Investigation And BCLIC And WNIC's Realization That Trust Assets Are Overvalued

119.   Claimants invoked the audit provisions of the Reinsurance Trust Agreements shortly after Huberfeld's arrest in June 2016.  In light of the arrest and related press coverage, Claimants specified that the audit would encompass (1) whether the investment of Trust assets complied with the terms of the Reinsurance Agreements and associated investment guidelines, (2) Beechwood's valuation of those assets, and (3) Beechwood's relationship with Platinum.

120.   Claimants hired Cornerstone Research ("Cornerstone") to perform the audit of the investments.   Cornerstone's work consisted of analyzing (1) the transactions and interconnections between Beechwood's investments of Trust assets and any Platinum related entities; (2) potential sources for conflict of interest between Beechwood and BAM, on the one hand, and Platinum, on the other; (3) whether the terms of Beechwood's investments of Trust assets were economically reasonable; and (4) the valuations of the Trust assets performed by Duff & Phelps on behalf of Beechwood.

121.   By August 2016, Claimants had determined that approximately $280 million of the $591 million assets held in Trust are Level 3 assets, which is the category of most-difficult-to-value assets, and approximately *$116 million* of the $302 million of Level 3 assets are inextricably intertwined with Platinum.[21]

---

[20]   *See* Kaja Whitehouse, *Hedge Fund Linked to Prison Guards' Union Goes to 'Liquidators,'* NY Post, Aug. 24, 2016, available at http://nypost.com/2016/08/24/hedge-fund-linked-to-prison-guards-union-goes-to-liquidators/. *See* Exh. T.

[21]   *See Fitch Places CNO Financial Group on Rating Watch Negative*, Reuters, Aug. 3, 2016, available at www.reuters.com/article/idUSFit969502. *See* Exh. U.

122.    Cornerstone also uncovered significant problems with the valuation reports that Duff & Phelps prepared and that Beechwood submitted to Respondent.   For example, their valuations (a) generally provided no explanations or evidence to support the valuations, (b) were often based on unsubstantiated, incorrect and sometimes irrelevant assumptions and questionable methodologies, (c) ignored evidence that the transactions were not at arm's-length, and (d) ignored the extensive dealings between Beechwood and Platinum that illustrated Beechwood's conflicts of interest.  Claimants  believe that their reinsurance Trusts are underfunded.

123.    Claimants recently learned through the audit that many investments of Trust assets Beechwood made were with Platinum-linked companies, and that Beechwood and Duff & Phelps have improperly valued such investments.  These include at least the following:

a.      Agera Energy.  Agera Energy was owned by a Platinum, which had purchased its assets from a distressed company.  Beechwood initially invested trust assets in Agera. Later, on June 9, 2016, one day after Huberfeld was indicted for bribing a union official to invest the union's funds with Platinum, Beechwood invested more of the Trusts' assets in loans to Agera as part of a restructuring.  Platinum brought the transaction to Beechwood, informing it that Platinum needed cash and was hoping Beechwood would assist it by arranging a deal to provide it.  Beechwood acceded to Platinum's request by agreeing to a deal to cash out Platinum's interest in Agera.  To justify these loans, Beechwood claimed that Agera's enterprise value had increased by 550% between Platinum's 2014 acquisition of Agera and June 2016.  In June 2016 alone, Beechwood and Duff & Phelps reported that Agera's enterprise valuation had increased by 46% *in just 3 weeks*.   The Agera restructuring was represented by Feuer and Taylor to

Claimants as mechanism to allow the Trusts to divest other bad Platinum-related investments.  In fact, the June 9 restructuring was a continuation of the pattern of using the Trusts to benefit Platinum because the Trusts put in new money which was used to cash out Platinum-related investments.

b.  Newel Trading.  Beechwood made tens of millions of dollars of short term loans to Newel Trading, a company owned by Platinum, using trust assets, but Beechwood failed to value these loans in its quarterly reports to Claimants. Beechwood was using the trust funds as Platinum's piggybank.

c.  LC Energy Operations.    LC Energy Operations is owned by Platinum. Beechwood invested trust assets in a loan to LC Energy that was used to retire Platinum's preferred securities.   Many of Beechwood's investments of Trust assets have been used to retire Platinum securities or cash out Platinum's positions.

d.  Implant Sciences Corp.  Platinum owns enough of the convertible debt of Implant Sciences Corp. to obtain a majority stake in the company.  Implant Sciences' business consists of an explosive trace detection product, but it has announced plans to sell that business and transition to jet-powered hoverboards.  Implant Sciences is a distressed company and was de-listed from the New York Stock Exchange in 2009.  In March 2015, Beechwood loaned Implant Sciences money from the Trusts, the proceeds of which were used to reduce a Platinum loan.  The loan's maturity date has repeatedly been extended due to Implant Sciences inability to pay.  The Trusts' current exposure to this investment is just under $7 million.  Beechwood and Respondent continue to value this investment at par.

34

e. <u>China Horizon Investment Group</u>.  Platinum was a significant shareholder in China Horizon Investments Group. Beechwood invested Trust assets in a loan to it, the proceeds of which were used to repay "shareholder loans."

f. <u>Golden Gate Oil LLC</u>.  Platinum had a significant equity stake in Golden Gate Oil LLC.  Beechwood used Trust assets for a loan to it, the proceeds of which were used to purchase Platinum's loan. Beechwood's valuation of Golden Gate relies on an assumption that oil will sell for $90 per barrel and that Golden Gate's wells will be productive, when oil is currently selling for $50 per barrel and less than 2% of Golden Gate's wells have been developed.  It is producing 30 barrels per day.  Beechwood and Respondent still value this asset at par.

g. <u>Northstar GOM LLC</u>.  Platinum has a significant equity stake in Northstar GOM LLC.  Beechwood invested Trust assets in a loan in which the proceeds were used to fund Platinum's purchase of the company.

h. <u>ALS Capital Ventures/Credit Strategies</u>.   Credit Strategies is a non-operating entity owned by Platinum.  Credit Strategies owns 83% of ALS Capital Ventures ("ALS"), a life insurance settlement fund that owns life insurance policies.  ALS pays the premiums on the policies and depends on death benefits to make profits. Beechwood invested Trust assets in loans to Credit Strategies, the non-operating company owned by Platinum, presumably to allow ALS to continue to make premium payments on the policies. As of August 31. 2016, Beechwood's loan of Trust assets to Credit Strategies has created an exposure of more than $10 million for the Trusts.  This loan is nothing more than a manner of using Trust assets to subsidize Credit Strategies' indirect investment in life insurance policies.  The

35

2014 audited financial statements for ALS show that, in 2014, ALS' "members" withdrew $26.3 million in "capital," or equity, while the Trusts' loan remains unpaid.

i.   Pedevco:  Pedevco is another distressed oil and gas development company, similar to GGO, discussed above.  Like GGO, Pedevco has numerous interrelationships with Platinum.  Platinum owns 100% of Pedevco's Series A preferred, along with 9.9% of its common stock.  Platinum also holds tranches A & B of Pedevco's senior secured debt and a Platinum representative sits on the Pedevco board of directors.  Beechwood invested millions of dollars of Trust assets in Pedevco's tranche B notes.

j.   PPCO:  In March 2016, a year and a half after Respondent advised Claimants that Respondent would unwind the Trusts' investments with Platinum and Platinum-related entities, Beechwood directly invested Trust assets with PPCO, a Platinum fund. This fund is now in liquidation, and the Trusts' exposure to PPCO is approximately $6.8 million.  Beechwood's investment of Trust assets in PPCO occurred within a couple of months of the June 9, 2016 Agera transaction, which was initiated when Platinum informed Beechwood of Platinum's need for liquidity and its desire to obtain that liquidity from Beechwood.  Beechwood and Respondent continue to value this investment at or near par, that is, in the range of $6.725 million to $6.86 million.  Given that PPCO is in liquidation and has suspended redemptions, that the FBI has raided Platinum's office, that Platinum is under federal investigation and that one of Platinum's founders is now under

indictment for bribing a union official to invest union funds in Platinum, the Trusts' may suffer a considerable loss in this Platinum-related investment.

k. <u>Black Elk</u>: Beechwood invested Trust assets in junk bonds issued by Black Elk Energy LLC, an oil company. With Black Elk in financial distress following an oil rig explosion, it sought to sell its principal assets. Platinum, which owned a majority interest in the company, asked owners of the junk bonds to subordinate their interests and allow Platinum to receive the proceeds of the asset sales. Beechwood voted the Trusts' shares of its junk bond in favor of self-subordination to Platinum, contrary to the interests of the Trusts. Platinum succeeded in obtaining all proceeds of the asset sales.

I.     **Feuer and Taylor Admit They Hid Huberfeld And Nordlicht's Interests In Beechwood.**

124.   In August 2016, after Huberfeld was indicted, Feuer and Taylor admitted with feigned disdain that they discovered Levy was using Trust assets to provide liquidity and profits to Platinum. Feuer and Taylor stated that they were "surprised" by how Levy used the Trust assets and that they "woke up to a new reality" that Levy was actually using the Trusts' funds to benefit Platinum. Feuer and Taylor admitted that Levy had loaned Trust assets to "highly questionable parties." Feuer and Taylor nonetheless replaced Levy as CIO with another employee of Platinum and continued to direct that Trust assets be used to aid Platinum.

125.   In another surprise bout of honesty, Feuer and Taylor recently (just this month) explained to Claimants that they have been associates of Huberfeld for many years. According to Feuer and Taylor, Huberfeld learned that they were starting a reinsurance company, and Huberfeld and Nordlicht then invested in Beechwood, taking a significant stake in the company. Once Huberfeld and Nordlicht became part of Beechwood, they used Beechwood to benefit

Platinum. Feuer and Taylor also admitted that Huberfeld and his family still owned preferred shares in Beechwood and that they are also creditors of Beechwood.

### J.    The Regulatory Orders.

126.    On September 29, 2016, the New York State Department of Financial Services ("NYDFS") and the Indiana Department of Insurance (IDOI) sent letters concerning BCLIC and WNIC, respectively, declaring that, after their investigation of the Trusts' assets, "a substantial portion of the current assets held within the Trust[s] are not in compliance" with state law.

127.    The NYDFS required Claimants to remediate this deficiency within ten days, and the IDOI directed that corrective actions be taken immediately.

128.    The letter from the NYDFS (Exh. D) states, in pertinent part:

> The New York State Department of Financial Services (the "Department") has conducted a review of the New York Insurance Regulation 114 Trust (the "Trust"), established pursuant to 11 NYCRR 126, which collateralizes the reinsurance treaty between Bankers Conseco Life Insurance Company ("Bankers Conseco") and Beechwood Re, Ltd. ("Beechwood Re").

> As a result of this review, which included a detailed analysis of assets and multiple rounds of communication between the Department, Bankers Conseco and Beechwood Re, *the Department has concluded that a substantial portion of the current assets held within the Trust are not in compliance with the standards set under 11 NYCRR § 126 (Insurance Regulation 114), which is also required under the express terms of the reinsurance treaty.* The Department observed that certain assets within the Trust were removed subsequent to the Department's approval of the reinsurance treaty and replaced with assets that do not comply with 11 NYCRR § 126(a)(2) ...

> *Bankers Conseco is hereby directed to remediate this deficiency within ten days* of the date of this letter by ensuring the assets held within the Trust meet the requirements of Insurance Regulation 114. Failure to bring the Trust into compliance may result in the denial of reserve credit and disciplinary action from the Department.

38

- (emphasis added)

129.   The letter from IDOI states (Exh. E), in pertinent part:

The Indiana Department of Insurance ("IDOI") has reviewed the above referenced Reinsurance Agreement and related trust funds ("Trust") as part of its Confidential Target Examination of WNIC, Appointment # 3920 ("Exam").

*The Reinsurance Agreement and related Trust are not in compliance with 760 IAC 1-55-4 ("Rule 55") ... At least some of the Level 3 Trust assets cannot be relied upon. ...*

*Additionally, BRE is in violation of IC 27-6-10-11 (a).*   That section of the Indiana Code requires BRE to report annually to the Indiana Commissioner substantially the same information as that required to be reported by licensed insurers on the National Association of Insurance Commissioners' annual statement form. *BRE has failed to file any such reports...*

Credit for reinsurance ceded under the Reinsurance Agreement shall not be allowed WNIC, for all of the above reasons, unless corrective measures, satisfactory to the IDOI, *are taken immediately...*

WNIC, BRE, and the Trustee, are subject to potential disciplinary action, based on the above violations.

- (emphasis added).

130.   Feuer and Taylor have advised Claimants that the non-qualified assets cannot be liquidated for months or perhaps years, given that, for example, PPCO is in liquidation and redemptions have been suspended, and due to the structure of many investments. Hence, Claimants were required by their regulators to recapture the business or else face disciplinary action, including the loss of its reinsurance credit for the ceded risks.

**K.      BCLIC and WNIC Terminate The Reinsurance Agreements.**

131.   On September 29, 2016, Claimants issued a Notice of Termination to Beechwood, immediately terminating all Reinsurance Agreements between the parties.  Claimants terminated

the agreements due to Beechwood's numerous incurable breaches of the Reinsurance Agreements and fraud upon Claimants since the inception of the relationship, among other reasons.

**L.      BCLIC and WNIC Exercise Their Contractual Right To Take Control Of Trust Assets.**

132.    On September 29, 2016, Claimants issued a notice to Wilmington Trust, the trustee of the Trusts, to transfer all Trust assets to Claimants.  Upon information and belief, Wilmington Trust is in the process of effectuating that transfer.

## DEMAND FOR ARBITRATION

133.    Pursuant to Section 10.1(d) of the Reinsurance Agreements, Claimants demand that Beechwood select its party-appointed arbitrator and provide Claimants with notice of the same within thirty (30) days of the date of this Demand for Arbitration and Statement of Claim. All party-appointed arbitrators must satisfy the qualifications set forth in the Reinsurance Agreements, which stipulate that the "arbitrators … must be officers or retired officers of life and health insurance or reinsurance companies (other than the Parties to this New York Reinsurance Agreement or their Affiliates)."

## STATEMENT OF VENUE

134.    Pursuant to Section 10(c) of the Reinsurance Agreements, the arbitration "shall be held in the City of New York, New York, unless a different location is mutually agreed upon by the Parties."

## REQUEST FOR EMERGENCY RELIEF

135.    BCLIC and WNIC request, pursuant to Rules 37 and 38 of the AAA Commercial Rules, that the Arbitrator issue an award for emergency relief by ordering that Beechwood open its books and records to inspection and copying by BCLIC and WNIC, and provide BCLIC and

WNIC with the documents and information set forth in Exh. A hereto. Claimants are entitled to such relief.

136.    Pursuant to the comprehensive auditing rights provided under the Reinsurance Agreements, the Claimants requested through its counsel, Willkie Farr & Gallagher LLP ("Willkie Farr"), certain documents and information from Beechwood on August 3, 2016. Exh. F, Ltr. from T. Cosenza to R. Coan, dated Aug. 3, 2016. Willkie Farr stated that the documents and information would help address Claimants' concerns regarding valuations of the Trust assets and their questions about Beechwood's longstanding relationship with Platinum and its principals. *Id.* Many of the documents on the list specifically related to the investments identified by Cornerstone as linked with Platinum. *Id.*

137.    Instead of undertaking efforts to make these documents available, however, Locke Lord, counsel for Beechwood, ignored Claimants' concerns regarding the valuations performed by Beechwood and Duff & Phelps and asked that Claimants prioritize their requests, eliminating any with purported limited value or relevance. Beechwood continued to dodge Claimants' requests throughout the remainder of the month. Counsel for Beechwood suggested that Claimants' requests concerning valuations of Trust assets and Beechwood's relationships with an apparent fraud scheme somehow did not relate to the Reinsurance Agreements or the insurance policies subject to them. Locke Lord then narrowed Claimants' requests to just five categories deemed acceptable to Beechwood, even though there is no provision in the Reinsurance Agreements empowering Beechwood to reconfigure Claimants' audit. Exh. G, Ltr. from S. Whitmer to T. McGinn, dated Aug. 11, 2016.

138.    Counsel from Beechwood next raised confidentiality concerns, obstructing Claimants' access to documents and information by demanding that Claimants sign

41

confidentiality/non-reliance agreements, instead of simple confidentiality agreements that do not entail a waiver of rights by Claimants. Counsel for Beechwood then compounded this obstruction by attempting to claw back documents already produced to Claimants on the basis that Claimants had not signed the confidentiality/non-reliance agreements.

139. To date, Claimants have been unable to obtain the documents and information necessary for it to complete its audit, despite the robust auditing rights conferred on them by the Reinsurance Agreements. For a number of reasons, the arbitrator has the authority to, and should, immediately compel Beechwood to provide these documents.

140. *First*, the Reinsurance Agreements confer broad auditing rights on the parties in the interest of transparency. Specifically, Section 3.4 of the Reinsurance Agreements states that the parties have the right to "audit, examine and copy (at such Party's own expense), during regular business hours, at the home office of the other Party, any and all books, records, statements, correspondence, reports and other documents that relate to . . . Insurance Policies" or the Reinsurance Agreements. The party subject to the audit must "cooperate fully and faithfully" and "disclose the existence of and produce any and all materials reasonably requested to be produced."[22]

---

[22] Additionally, Section 4.5 of the Reinsurance Agreements mandates that Beechwood "shall prepare written reports on a quarterly basis (the 'Quarterly Reports') setting forth, among others, the aggregate fair market value of the Qualifying Trust Assets maintained in the Reg 114 Trust Account and the assets maintained in the Supplemental Trust Account (both on an asset-by-asset basis and a cumulative basis, but by trust account), together with supporting detail, and such other information reasonably necessary to verify the compliance of the assets with all Investment Guidelines." To the extent that there is a dispute regarding the contents of the Quarterly Reports, Section 4.5(b) provides a mechanism for a Third Party Accountant to review the reports and to resolve the dispute. Section 4.5(b) states that Beechwood "shall permit [WNIC or BCLIC] and/or the Third Party Accountant to audit its records in order to perform their respective reviews. Reinsurer shall cooperate fully with such audit."

141.  On June 16, 2016, the Claimants invoked their contractual right to audit Beechwood.  Despite Beechwood's contractual obligation to "cooperate fully and faithfully" with Claimants' audit and to provide access to "any and all" materials "reasonably requested" "that relate to" the agreements or the underlying policies, Beechwood has repeatedly stymied Claimants attempts to obtain pertinent information.  Even though the law is plain that the phrase "relate to" is exceptionally broad,[23] Beechwood has adopted an exceedingly narrow interpretation of the audit provision and has claimed, without basis, that the requests for information concerning the valuation of the Trust assets and Beechwood's connections to Platinum do not "relate to" the Reinsurance Agreements or the insurance policies.  But of course they do, in the following ways, among others:  (1) the Trusts are created by the Reinsurance Agreements, and hence anything that relates to Trust investments necessarily "relate to" the Reinsurance Agreements, including whether, among other things, Trust assets were invested with affiliated parties, which necessarily requires knowing the ownership structure of Beechwood,[24] and why Beechwood made so many Platinum-related investments; (2) many of the Trusts' investments are with Platinum or Platinum-owned entities, and thus those investments certainly "relate to" the Reinsurance Agreements; (3) Beechwood is the Reinsurer under the Reinsurance Agreements and thus the issue of what Beechwood is and who owns it "relates to" the Reinsurance Agreement; (4) the ownership of Beechwood is a direct trigger of certain rights and actions under the Reinsurance Agreements (e.g., § 4.6); (5) Claimants are entitled to terminate

---

[23] *See, e.g., Coregis Ins. Co. v. American Health Foundation, Inc.*, 241 F.3d 123 (2d Cir. 2001) ("The term 'related to' is typically defined more broadly and is not necessarily tied to the concept of a causal connection. Webster's Dictionary defines 'related' simply as 'connected by reason of an established or discoverable relation.'").

[24] The last page of Exhibit C of the Reinsurance Agreements broadly prohibits investments with affiliated entities (like Platinum, which would appear to be an affiliated company given the common equity owned by Nordlicht and Huberfeld).  Exhs. A and B.

the Reinsurance Agreements in the event of any breach (§ 9.2(b)(v)), and hence whether any breach occurred "relates to" the Reinsurance Agreement, including whether there were improperly valued assets, whether transactions occurred with affiliates, or whether Trust assets were otherwise misused or appropriated; (6) whether the Quarterly Reports (§ 4.5) are complete and accurate; and (7) whether Beechwood's Platinum and Platinum-related assets were arm's-length transactions or affiliated transactions (precluded by the Reinsurance Agreements), which necessarily involving examining the Beechwood-Platinum relationship, including common ownership.

142.    Besides all of that, it is galling for Beechwood to narrowly interpret these broad audit rights when the cat is out of the bag on the fraud it perpetrated against Claimants.  Given that Beechwood owes fiduciary duties to Claimants, now is the time for honesty and inspection, not even more secrecy and misdirection.  It must not be forgotten that Claimants entrusted Beechwood with more than *$550 million* in funds to invest to protect policyholders, and nothing is more disturbing than a fiduciary that continues to stymie the parties to whom it owes fiduciary duties from learning the truth.

143.    *Second*, the emergency arbitrator is empowered to provide this relief under several AAA Commercial Rules, which are incorporated into the Reinsurance Agreements.  R-38 allows for broad emergency relief, and R-37 specifically vests the arbitrator with authority to "take *whatever* interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property." (emphasis added).  A full audit of the Trusts will aid Claimants' efforts to protect and conserve assets being withdrawn from the Trust.  Indeed, Claimants are not even sure of the true value of many of the Trust assets, and only by

44

uncovering the truth can Claimants adequately protect and conserve the Trust property and protect policyholders.

144.    Significantly, the Reinsurance Agreements' arbitration provision and the AAA Commercial Rules (R-22) afford the Arbitrator broad discretion and the authority to control the timing and scope of discovery.  The emergency Arbitrator can thus order this audit and inspection under the express grant of authority set forth in R-22.

145.    *Third*, the arbitration clause itself grants the arbitrator vast authority to control the proceedings.  *Id.* at § 10(e) (arbitrator "shall not be bound by legal rules of procedure and may receive evidence in such a way to do justice between the Parties.").  The emergency arbitrator is expressly permitted to craft the proceedings as justice requires. Here, justice requires, at a minimum, a complete and thorough audit of Beechwood so that the full extent of its wrongdoing can be uncovered.

146.    WNIC and BCLIC, and its thousands of policyholders, will suffer immediate and irreparable loss or damage in the absence of the requested emergency relief.  As set forth in greater detail above, there exists strong evidence that Beechwood made improper investments of Claimants' Trust assets (as two state regulators have *already* concluded) and that the Trusts are underfunded.  BCLIC and WNIC also require all of the requested documents and information now that it has terminated the Reinsurance Agreements and must itself manage Trust assets. Additionally, without the necessary information, BCLIC and WNIC may not be able to accurately report to state insurance regulators the magnitude of injury inflicted by Beechwood on their assets, and may not be able to comply with the regulatory directives from the NYSDFS and IDOI.  Likewise, without all of the requested information, CNO may be unable to satisfy its obligation to its shareholders to report the financial harm inflicted on the company by

45

Beechwood.  Accordingly, the emergency relief is necessary to avoid irreparable harm to WNIC and BCLIC, and Claimants request that the arbitrator hold Beechwood to its contractual audit obligations and to finally be up front with WNIC and BCLIC.

## DEMAND FOR RELIEF

147.  Claimants contemplate filing an Amended Statement of Claim once they obtain the necessary documents and information requested in their Request for Emergency Relief, should the Emergency Arbitrator grant that request.  At present, however, Claimants state the following for their Demand for Relief:

A.  Claimants seek compensatory, consequential and punitive damages against Beechwood, based upon Beechwood's incurable material breaches of the Reinsurance Agreements, and breaches of fiduciary duties and the obligation to deal honestly and in good faith, and conversion and fraud, including without limitation: (a) violating the Reinsurance Agreements' investment guidelines by investing in below investment-grade instruments; (b) providing false and misleading valuations and credit ratings to many investments Beechwood made for the Trusts, including but not limited to the Trusts' investments in the Platinum funds and other Trust investments related to the Platinum funds and shoring up the Platinum fraud scheme; (c) failing to top up the Trusts pursuant to the Reinsurance Agreements based on the accurate and true valuations for the Platinum funds and other Platinum-related investments; (d) withdrawing $134 million from the Trusts as purported gains belonging to Beechwood when in fact the Trusts had losses using proper accounting and valuations and excluding non-qualified assets, as a result of Beechwood's use of Trust assets to support Platinum and its fraud scheme to the detriment of the Claimants and the Trusts; and (e) failing to provide Claimants with accurate information, including deliberately lying to Claimants concerning Beechwood's ties to Platinum and materially breaching the audit provisions of the Reinsurance Agreements by failing to

provide accurate and complete information, and in the case of the WNIC Reinsurance Agreement, failing to provide an annual report for 2015.

B.      Claimants seek compensatory, consequential and punitive damages against Beechwood, based upon Beechwood's fraudulent activities, conversions, intentional and negligent misrepresentations, as described above, including, without limitation and by way of example only, (a) fraudulently inducing Claimants to enter into the Reinsurance Agreements by failing to disclose the true owners of Beechwood and misrepresenting its true owners, and by misrepresenting to Claimants that numerous professionals were officers of Beechwood when they in fact worked for Platinum, and misrepresenting the source of its capitalization; (b) fraudulently or negligently investing Trust assets to support the Platinum fraud scheme, including but not limited to direct Trust investments into the fraud scheme; (c) fraudulently or negligently misrepresenting to Claimants the true value of Trust assets in order to avoid having to make shortfall payments and to instead pilfer the Trust assets for its own ill-gotten gains, in the amount of at least $134 million; and (d) failing to provide Claimants with accurate information, including deliberately lying to Claimants concerning its ties to Platinum, ownership structure, and the true status of its employees.

C.      Claimants seek compensatory, consequential and punitive/treble damages against Beechwood for its participation in a civil conspiracy, as well as its violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1961 et seq., in which Beechwood, along with other co-conspirators, including, but hardly limited to, Platinum and Nordlicht, Huberfeld, Levy, Feuer and Taylor, conspired and coordinated an effort to convert and apply Claimants' assets, including but not limited to the Trust funds and the negative ceding commission, to support an illegal fraud scheme.

Claimants reserve the right to supplement this Statement of Claim, particularly as its investigation into the fraud develops.   Moreover, Claimants shall seek an award of interim security as soon as practicable.

Dated:       New York, New York                      WINSTON & STRAWN LLP
             September 29, 2016

                                            By:        /s/  Adam J. Kaiser

                                                   Adam J. Kaiser
                                                   John A. Aerni
                                                   Matthew A. Stark
                                                   akaiser@winston.com
                                                   jaerni@winston.com
                                                   mstark@winston.com
                                                   WINSTON & STRAWN LLP
                                                   200 Park Avenue
                                                   New York, New York 10166
                                                   (212) 294-6700
                                                   (212) 294-4700 (fax)

                                                   *Attorneys for Claimants*

48